**OKLAHOMA CORPORATION COMMIS-
SION, Plaintiff,**

v.

**The UNITED STATES of America,
Defendant.**

Department of Highways of the State of
Oklahoma, et al., Intervening
Plaintiffs,

The Arkansas Western Railway Company
et al., Intervening Defendants.

Civ. A. No. 64–142.

United States District Court
W. D. Oklahoma.

Nov. 25, 1964.

Charles O. Ham, Jr., Oklahoma City, Okl., for Okla. Corp. Commission, plaintiff.

Leonard L. Ralston and David Kline, Asst. U. S. Dist. Atty., for United States, defendant.

A. A. Schreiber, Oklahoma City, Okl., for Dept. of Highways, Bert Barefoot, Jr., Oklahoma City, Okl., for Metropolitan Paving Co., Troy Shelton, Oklahoma City, Okl., for Dolese Bros. and The Dolese Co., Tom S. Williams, Oklahoma City, Okl., for Harter Concrete Products Co., intervening plaintiffs.

John H. D. Wigger, Robert S. Burk, and B. Andrew Potter, for I. C. C., John E. McCullough, John C. Ashton, Jr., Wm. Bruce Kopper, Ernest D. Grinnell, Jr., St. Louis, Mo., and Franklin, Harmon & Satterfield, Oklahoma City, Okl., for Arkansas Western Ry. Co. and others, Don McDevitt, Chicago, Ill., for Chicago, Rock Island & Pacific RR Co., James D. Gibson, Muskogee, Okl., for Okl. & Gulf Ry., Midland Valley RR, and Okl. City-Ada-Atoka Ry., intervening defendants.

Before HILL, Circuit Judge, and DAUGHERTY and BROWN, District Judges.

PER CURIAM.

This action was brought by the Oklahoma Corporation Commission to enjoin, annul and set aside an order entered February 27, 1964, by the I. C. C. in a proceeding entitled "No. 34034, Oklahoma Intrastate Freight Rates and Charges." Upon petition of eighteen (18) principal railroads operating in Oklahoma, the I. C. C. commenced an investigation under section 13(4) of the Interstate Commerce Act [1] to determine whether or not rates and charges of the common carriers by railroad, or any of them, for the intrastate transportation of certain commodities made or imposed by authority of the State of Oklahoma had caused or will cause, by reason of the failure of such rates and charges to include increases corresponding to those permitted by the I. C. C. in the interstate rates and charges on like traffic in Ex Parte Orders Nos. 162, 166, 168, 175, 196, 206, 212, and 223, any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce, on the one hand, and interstate or foreign commerce, on the other, or any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce; and, if so, to determine what rates and charges should be prescribed to remove any unlawfulness found to exist.

After a hearing, the I. C. C. made findings as set out below.[2] The said findings

[1] "§ (4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce (which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any State), which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, discrimination, or burden: *Provided*, That upon the filing of any petition authorized by the provisions of paragraph (3) hereof to be filed by the carrier concerned, the Commission shall forthwith institute an investigation as aforesaid into the lawfulness of such rate, fare, charge, classification, regulation, or practice (whether or not theretofore considered by any State agency or authority and without regard to the pendency before any State agency or author-

ity of any proceeding relating thereto) and shall give special expedition to the hearing and decision therein." (49 U.S.C. § 13(4).)

[2] "1. The conditions incident to the intrastate transportation within Oklahoma of grain and grain products and commodities taking the same rates, sand (except industrial sand), gravel, broken, ground, and crushed stone and rock, and related articles, clay or shale cinders, agricultural and crushed limestone, lime, and asphalt rock and related articles, are no more favorable than those incident to the interstate transportation of like traffic to, from, and through points in Oklahoma.

"2. The amount and percentages by which interstate freight rates and charges on the commodities named in finding I between points in Oklahoma and points in adjoining States were increased, as authorized in the various ex parte proceedings, from Ex Parte No. 162 to and including Ex Parte No. 223, are just and reasonable.

"3. The present Oklahoma intrastate freight rates on the commodities named in finding 1, imposed by authority of the State, are abnormally low, and are not contributing their fair share of the revenues required by the respondents to enable them, under honest, economical, and efficient management, to provide adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service, thereby accomplishing the purposes of the Interstate Commerce Act, as set forth in the

were implemented by an order of the I. C. C. dated February 27, 1964, as clarified by an order of the I. C. C. dated April 3, 1964. Thereafter, pursuant to a hearing before this Court, a refunding provision was put into effect by order of the Court, permitting the involved rates and charges to go into effect. This was done pending the completion of judicial review and the further order of this Court.

Many courts have had previous occasions to consider actions of this character. On such occasions, they have stated that an order of the I. C. C. carries a strong presumption of validity which is not weakened by the fact that it has been challenged in court and that the scope of judicial review of administrative orders of the I. C. C. is very limited. I. C. C. v. Jersey City, 322 U. S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147. Administrative orders entered by the I. C. C. in the exercise of its power are not to be overturned on judicial review unless they are based upon a mistake of law, are made without a hearing, exceed constitutional limits, are unsupported by the evidence, or for some other reason amount to an abuse of power. State Corp. Commission of Kansas v. United States, D.C., 216 F.Supp. 376. This Court has no concern with the correctness of the I. C. C.'s reasonings or the soundness of its conclusions, nor may the court substitute its own view for the administrative judgment. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821. It is the I. C. C., not the reviewing court, that judges the weight of the evidence, Atchison, T. & S. F. Ry. Co. v. United States, D.C., 218 F.Supp. 359. All pertinent evidence bearing on the issues tendered the I. C. C. in a proceeding such as this should be submitted

national transportation policy declared by the Congress, to develop and preserve a national transportation system adequate to meet the needs of the commerce of the United States, of the postal service, and of the national defense.

"4. The burden thus cast on interstate commerce by the present Oklahoma intrastate freight rates on the commodities named in finding 1, is undue, in and to the extent that such intrastate rates and charges are less than they would be on the bases herein approved; and that such intrastate rates and charges cause, and for the future will cause, undue, unreasonable, and unjust discrimination against, and an undue burden on interstate commerce.

"5. The unlawfulness herein found to exist should be removed by applying to the Oklahoma intrastate rates and charges on the commodities described in finding 1, the same respective increases as are maintained by the respondents on like interstate traffic between points in Oklahoma and points in adjoining States, as authorized by the Interstate Commerce Commission in Ex Parte Nos. 162 to and including Ex Parte No. 223, provided that increases may not be made in intrastate rates to levels higher than the interstate rates on like traffic to, from, or through points in Oklahoma for like or greater short-line distances over the same lines of railroads.

"6. The establishment of increases in rates and charges as provided in finding 5 thereof will not result in unreasonable rates or charges, or in rates and charges that are unreasonable in relation to interstate rates or charges, and will increase the revenues of the respondents by substantial amounts.

"7. The present intrastate rates on bituminous coal, industrial or silica sand and cement, and on the unspecified so-called miscellaneous commodities, and the minimum charge per car, minimum charges on less-than-carload traffic, and the minimum rate on less-than-carload traffic accorded pickup and delivery, are not shown to cause any undue or unreasonable advantage, preference, or prejudice, or unjust discrimination against, or any undue or unreasonable burden on interstate or foreign commerce.

"The foregoing ultimate findings are without prejudice to the right of the authorities of the State of Oklahoma, or any interested party, including any of respondents, to apply for modification thereof, as to any individual intrastate rate or charge affected thereby, on the ground that such rate or charge is not related to the interstate rates and charges on like traffic in such a way as to contravene the provisions of the Interstate Commerce Act or, in the case of any individual respondent, that it does not desire to establish such rate or charge."

to it in the first instance and should not be received by the Federal District Court in a suit to set aside and enjoin the enforcement of the Commission's order as though it were conducting a trial de novo. New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492.

Applying these rules to the instant situation, two basic questions must be answered, namely, whether or not the I. C. C. applied an erroneous rule of law in reaching its conclusion and whether or not the record reveals substantial evidence to support said conclusion.

Prior to answering the above questions, there are two "procedural" problems which should be disposed of by the Court. First, the plaintiff asserts that the denial by the I. C. C. of its motion for further hearing and reconsideration prevented the plaintiff from securing a "full hearing" as required by the I. C. Act and the Administrative Procedure Act. We cannot agree. Section 17(6) of the I. C. Act provides that a rehearing *may* be granted and shall be governed by such general rules as the I. C. C. may establish. The U. S. Supreme Court, in I. C. C. v. Jersey City, supra, held that "[i]t has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion". The reason for this is that if it was otherwise "there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." Northern Valley Transfer, Inc. v. I. C. C., D.C., 192 F.Supp. 600, 606. Since there is absent any affirmative showing of abuse of discretion by the I. C. C. in denying said motion, we find no error. Second, the plaintiff contends that the order of April 3, 1964,[3] entered by I. C. C., was a modification of its previous order and therefore notice and a hearing are required by law. The defendants

counter by saying that this April 3, 1964, order was a clarification of the intent of the previous order which makes no substantive change and no notice and hearing are required. Section 16(6) of the I. C. Act provides that when an order is to be suspended or modified, it shall be "upon such notice and in such manner as it (I. C. C.) shall deem proper", while the power of the I. C. C. to correct inadvertent errors is found in Section 17(3) of the I. C. Act. American Trucking Ass'ns v. Frisco Transportation Co., 358 U.S. 133, 79 S.Ct. 170, 3 L.Ed.2d 172. It seems clear to the Court that the April 3 order simply states explicitly what is implicit in the previous order and decision. It simply makes clear that the scope of the findings made in this matter are limited to the commodities involved and the rate schedule submitted by the carriers. The order makes no substantive change in the previous order and therefore we can see no legal reason, either pursuant to the provisions of the I. C. Act or the A. P. Act, for holding that notice and a hearing are necessary to due process. No Authority has been cited to the Court to sustain such a position and diligent research has produced none.

Another question should be answered before the review of the record is undertaken. The plaintiff seems to contend that the order of the I. C. C. must contain both a finding of (1) "undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand"; *and* a finding of (2) "any undue, unreasonable, or unjust discrimination against, or undue burden on, interstate or foreign commerce." This is not the case. The statute, Section 13(4) of the I. C. Act, is couched in alternative phrasing which gives the I.

3. "And it further appearing, That, as indicated at page 209 of the said decision and order of Division 2, in the paragraph preceding the 'Ultimate findings and conclusions', the intent thereof was to restrict the finding of unlawfulness to the rates on the commodities listed in finding 1, and then only to the extent that the respondents sought to increase such rates in the petition which caused the proceeding to be instituted."

C. C. the choice between (1) and (2) above, so that its order can be based upon either a finding of (1), or a finding of (2). In this case we are dealing with the (2) alternative and the first (1) alternative is not involved. See King v. United States, 344 U.S. 254, 269 fn. 14, 73 S.Ct. 259, 97 L.Ed. 301 and cases cited therein.

 The power of the I. C. C. to require states to raise their intrastate rates depends upon whether intrastate traffic is contributing its fair share of the earnings required to meet maintenance and operating costs and yield a fair return on the value of property directed to the transportation service both interstate and intrastate. North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760; United States v. Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181. Therefore, it seems clear that whether or not the involved intrastate rates have created an unreasonable or unjust discrimination against interstate commerce is determined "primarily by criteria or factors pertaining to the overall profitable operation of the railroad carriers involved in interstate commerce". State Corp. Commission of Kansas v. United States, supra, 216 F. Supp. p. 380. In other words, it is system-wide experience that warrants the greatest consideration because, in that respect, the ultimate purpose of promoting a safe, adequate, economical and efficient national transportation system under the I. C. Act can best be effectuated. Ibid.

Following a complete and thorough examination of the record, in light of the above principles, the Court concludes that the I. C. C. applied the correct rule of law to the problem which was before it for consideration.

 Turning to the substantial evidence question, the Court understands the plaintiff's argument to be a lack of said evidence in two broad areas. First, the evidence does not show that conditions incident to the Oklahoma intrastate freight transportation in issue are not more favorable than those incident to Oklahoma interstate transportation. In this regard the plaintiff further contends that the evidence fails to reveal that conditions are substantially the same with respect to all factors bearing on reasonableness of the rates under consideration. Second, the evidence will not sustain a finding that the raised intrastate rates will increase the revenues of the railroads by substantial amounts. The Court cannot agree with either contention for the record reveals a wealth of substantial evidence which supports both positions.

The record reveals the following evidence in support of the I. C. C.'s findings. Since 1946 the cost of operating Oklahoma railroads has increased at a greater pace than the freight revenues. Net earnings have dropped slightly from $112,000,000 in 1946 to $105,000,000 in 1960. During that same period of time, the Oklahoma railroads have increased their net investment over $600,000,000 resulting in a rate of return in 1960 of less than 3% which is poor to say the least. Also, during this same period of time, expenses were on the increase. Even though the number of employees has decreased substantially, total compensation paid said employees has increased from $497,000,000 to $616,000,000. There has been a 120% increase in material and supply costs, using 1946 as the base year, and Oklahoma taxes paid per mile of road have increased to 181% in the year 1961. Another point is that during this same period of time, the efficiency of the railroads has substantially increased. Average speed between terminals has increased; the gross freight ton-miles per train hour has an 80% increase; and the net freight ton-mile per train hour shows an 88% increase by 1961. See Witness Halpin's Exhibit 20.

The operations of the Frisco in this regard are typical. The Frisco's operating ratio has gone down due to economies and improvements in operations such as complete dieselization, electronic accounting systems, electronic hump

yards and terminals, improved operating performance factors, and labor reductions wherever possible. See Witness Richter's Exhibit 28.

Further, there is "positive evidence" to the effect that the relative cost of intrastate traffic was as great as that of shorter hauls, more terminal handling and switching, higher wage rates on local hauls, and relatively smaller gross ton-mile production, the cost of performing comparable interstate and intrastate operations are, at least, equal and probably higher as to the latter. See Witness Allen's Exhibit 40; Witness Lester's Exhibit 41; Transcript pp. 206–218.

 As far as the intrastate freight transportation conditions not being less favorable contention of the plaintiff is concerned, it is true that more evidence is needed than the mere showing "that intrastate and interstate traffic was handled by the same crews and intermingled in the same movement". Public Service Commission of Utah v. United States, 356 U.S. 421, 427, 78 S. Ct. 796, 800, 2 L.Ed.2d 886. But this does not mean that conditions relevant to both intrastate and interstate transportation must be exactly the same with respect to all factors bearing on the reasonableness of the involved rates. The whole thrust of the voluminous evidence in this record is to the effect that costs are higher, efficiency is better, the rate of return is depressed, net earnings are stagnant, and the out-of-pocket costs in relation to the intrastate revenues are causing a net loss to the railroads on intrastate freight. It can hardly be said with any justification based on this record that conditions are more favorable to intrastate freight transportation. In fact it seems reasonable to say that the ultimate consequences of the low intrastate rates is a depressive result on the freight transportation system as a whole.

 In dealing with the plaintiff's second contention that the increased rates will not produce additional revenue, the tenor of its argument is that the diversion of traffic from the railroads to other forms of transportation will result in a loss of revenue rather than a gain. This proposition can only be answered as a matter of informed judgment. The opinions of railroad traffic experts in judging the effect of an increase in intrastate rates is substantial evidence of value. State Corp. Commission of Kansas v. United States, supra. The railroads presented testimony by various traffic officials to the effect that any diversions suffered would not sufficiently offset the increased revenues to prevent a substantial increase in such revenues. While the record reveals conflicting evidence on this point, the I. C. C. weighed the evidence and decided that increased revenues would result from increased rates. It can not be said that substantial evidence is not present to support that conclusion. The record discloses that all the increases from 1946 to 1961 in interstate and intrastate rates have not reduced the total tons shipped by the railroads. In fact, the tonnage has remained constant despite increased rates, while gross revenues have increased between 46% to 50% over the year 1946. See Witness Halpin's Exhibit 22, Sheet 1. Further, should diversion occur in relation to sand, gravel and crushed, ground and broken rock, which represents about 68% of the total carload intrastate traffic in Oklahoma, it can reasonably be said that no loss of revenue will ensue to the railroads because of the degree to which out-of-pocket costs exceed revenue obtained from handling these commodities. Witness Halpin's Exhibits 19, pp. 12–14; 25; Transcript, p. 105. Lastly, the service aspect of rail traffic is important, especially in relation to possible increased operating costs of competing carriers and to diversions such as portable pits with which the railroads could not compete no matter how high or low the freight rates. See Witness Grasser, Transcript, p. 172; Witness Baker's Exhibit 78, p. 13; Transcript, p. 291.

 The Court believes the I. C. C. had before it all of the evidence which was necessary for it to make a proper

decision in accordance with the criteria which must be considered in making that decision. While the Court may not agree with the initial determination, the expertise of the I. C. C. will prevail if substantial evidence is present, otherwise its purpose cannot be justified. The evidence is substantial, therefore the Orders of the I. C. C. should be affirmed.

Counsel for the defendants will prepare and submit an appropriate order and decree. The Judgment of the Court shall not become effective until a formal decree is submitted, signed and filed with the clerk of the Court.